

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 19, 2017**



**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 17-40659-mxm-11 |
| HBT JV, LLC et al., | § | |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |
| | § | |

| | | |
|---|---|---|
| Victor Bernal, individually and on behalf of HBT JV, LLC, a Texas Limited Liability Company, | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 17-4018-mxm |
| | § | |
| DK8 LLC, HBT Land, LLC, Kenneth L. Schnitzer, Jr., an Individual, and HBT JV, LLC a Texas Limited Liability Company (a nominal Defendant), | § § § § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION DENYING
## SPECIFIC PERFORMANCE AND RELATED RELIEF

On April 3, 4, 10, and 11, 2017, the Court held a trial on Plaintiff Victor Bernal's specific performance cause of action against DK8 LLC ("**DK8**") and HBT Land, LLC ("**HBT Land**"), as well as those portions of Bernal's breach-of-contract and declaratory-judgment causes of action related to the specific performance cause of action. For the reasons set forth below, the Court will enter judgment for DK8 and HBT Land denying Bernal's specific performance cause of action.

## I.       PROCEDURL BACKGROUND

On January 11, 2016, Plaintiff Victor Bernal ("**Bernal**") filed his *Original Petition, Application for Temporary Restraining Order and Injunctive Relief, and Application for Permanent Injunction* (the "**Original Petition**") in the 95th Judicial District of Dallas County (the "**State Court Lawsuit**").1 On November 30, 2016, Bernal filed his *Fifth Amended Petition and Application for Permanent Injunction* (the "**Fifth Amended Petition**")2 in the State Court Lawsuit.3

On February 20, 2017 (the "**Petition Date**"), HBT JV, LLC ("**HBT JV**") and DK8 each filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On that same day, HBT JV and DK8 filed a *Joint Motion for Joint Administration*4 in each of their bankruptcy cases and HBT JV filed its *Notice of Removal* pursuant to 28 U.S.C. § 1452, 28 U.S.C.

---

1 DK8 Ex. 24.

2 The Fifth Amended Petition asserts various claims and causes of action against the various Defendants through eleven different Counts, including specifically, **Count 1: Breach of Contract** against various Defendants; **Count 3: Specific Performance** against DK8 and HBT Land; and **Count 7: Request for Declaratory Relief** against all Defendants.

3 DK8 Ex. 26.

4 The *Joint Motion for Joint Administration* came on for hearing on February 22, 2017 and was granted pursuant to the *Order Granting Motion for Joint Administration* entered February 23, 2017.

§ 1334(b), Federal Rule of Bankruptcy Procedure 9027 and N.D. Tex. L.B.R. 9027-1, removing the State Court Lawsuit to this Court, which has now been assigned the above-referenced adversary proceeding number (the "*Adversary Proceeding*").5

On March 20, 2017, the Bankruptcy Court held a status conference in this Adversary Proceeding. During the status conference, and pursuant to the prior agreement between Bernal and the Defendants detailed in the Sale Procedures Order,6 Bernal and the Defendants agreed that the trial on the specific performance count (Count 3), as well as those portions of the breach-of-contract and declaratory-judgment counts (Counts 1 and 7, respectively as they related to the specific performance count) (collectively, the "*Specific Performance Counts*"),7 should be tried on an expedited basis in this Court, whereas all other claims, causes of action, and counts in the Adversary Proceeding (the "*Abated Counts*") should be abated until further order of the Court. In addition, the parties reserved any and all of their rights concerning the Abated Counts.

---

5 Defendants DK8, HBT Land, and Kenneth L. Schnitzer, Jr. timely filed their *Defendants' Rule 9027(e)(3) Statement and Corporate Ownership Statement* on March 6, 2017 [Adv. ECF No. 18] wherein Defendants consent to the entry of final orders or judgments by the Bankruptcy Court in this Adversary Proceeding.

Plaintiff Bernal filed his *Bernal's Rule 9027(e)(3) Statement* on March 20, 2017 [Adv. ECF No. 28], after the expiration of the 14-day deadline provided in Bankruptcy Rule 9027(e)(3), wherein Bernal does not consent to the entry of final orders or judgments by the Bankruptcy Court in this Adversary Proceeding. At the conclusion of the trial, Defendants reserved any and all rights to contest the effectiveness and validity of the tardily filed Rule 9027(e)(3) statement filed by Plaintiff Bernal.

6 The term "*Sale Procedures Order*" means that certain *Order (I) Approving Sale Procedures Relating to Sale of Substantially all of the Estate's Assets; (II) Approving Procedure for Granting Bid Protections; (III) Scheduling Objection Deadlines and the Hearing to Approve the Sale; (IV) Approving the Form and Manner of Notices; (V) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; and (VI) Granting Related Relief* [ECF No. 111] entered on March 17, 2017 in the HBT JV bankruptcy case.

7 Pursuant to the Sale Procedures Order, Bernal filed his *Notice of Election* on March 28, 2017 [ECF No. 138; Adv. ECF No. 39]. The election notified all parties and the Court that Bernal intended to pursue the Specific Performance Counts. In response to Bernal's Notice of Election, DK8 filed *DK8 LLC's Objection to Bernal Notice of Election and/or Request for Clarification Prior to Specific Performance Trial* on March 29, 2017 [Adv. ECF No. 49] asserting that Bernal added language that went beyond the scope of the election notice in the Sale Procedures Order and appeared to disclaim any legal consequences from making such an election. On April 3, 2017, HBT Land and Schnitzer filed their *Joinder of HBT Land, LLC and Kenneth L. Schnitzer, Jr. in DK8 LLC's Objection to Bernal Notice of Election and/or Request for Clarification Prior to Specific Performance Trial* [Adv. ECF No. 79].

The trial on the Specific Performance Counts was scheduled, by agreement of the parties, to begin on April 3, 2017.

## II. JURISDICTION, VENUE, AND STATUTORY AND CONSTITUTIONAL AUTHORITY

The Court has jurisdiction over the Specific Performance Counts in the Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Venue is proper pursuant to 28 U.S.C. § 1409(a). The Court finds and concludes that the Specific Performance Counts in the Adversary Proceeding constitute a core proceeding in which the Court has both statutory and Constitutional authority to enter a final order and judgment, notwithstanding Bernal's Rule 9027(e)(3) Statement.[8]

Several factors support the Court's findings and conclusion that the Specific Performance Counts constitute a core proceeding. First, Bernal seeks to compel DK8, a debtor, to assign property of the estate (its membership interest in HBT JV) to Bernal, relief that is squarely within this Court's core jurisdiction. Second, although Bernal also seeks to compel assignment of Real Estate (defined below) owned by HBT Land, a non-debtor, Bernal has argued several times in this proceeding that the Real Estate is inexorably and inextricably tied to the sale of the dealership assets owned by HBT JV. Third, the Real Estate is the subject of a lease between HBT JV and HBT Land which constitutes a significant asset of HBT JV's bankruptcy estate. Fourth, all the parties in the Adversary Proceeding agreed to modify the temporary injunction that was in place when the State Court Lawsuit was removed to this Court, to allow DK8, HBT Land, and HBT JV to market and potentially sell their respective assets pursuant to the terms of the Sale Procedures

---

[8] The Court will determine at the appropriate time whether this Court has both statutory and Constitutional authority to enter final orders and judgments concerning the Abated Claims.

Order, which was negotiated between and agreed upon by all of the parties to this Adversary Proceeding. Finally, each of the parties consented to this Court conducting the trial of the Specific Performance Counts in the Sale Procedures Order.[9] For these reasons and under the unique and peculiar factual and procedural circumstances of this case, the trial of the Specific Performance Counts constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E) and (O) in which this Court has statutory and Constitutional authority to enter a final order or judgment.

Because the Specific Performance Counts are inexorably and inextricably related to the Sale Procedures Order, the Court is entering this Memorandum Opinion in both this Adversary Proceeding No. 17-4018 and the jointly administered Bankruptcy Case No. 17-40659.

### III.  FACTUAL HISTORY

#### A.  HBT JV Commences Operations in 2011

HBT JV owns and operates a Honda automobile dealership (the "***Dealership***") that began operations in May 2011 in Burleson, Texas. At that time, HBT JV was owned (52%) by DK8 and (48%) by Henry Coffeen or an entity he controlled ("***Coffeen***").

On May 1, 2011, HBT JV entered into a real property lease (the "***Real Estate Lease***") with HBT Land pursuant to which HBT JV leased the real property on which the Dealership is located (the "***Real Estate***").[10]

On May 20, 2011, HBT JV entered into the Honda Automobile Dealer Sales and Service Agreement (the "***Dealership Agreement***") with American Honda Motor Co., Inc. ("***Honda***").[11] The Dealership is part of Honda's Ethnic Minority Dealership ("EMD") Program, under which

---

[9] *See* Sale Procedures Order ¶ 4, at 4–5.

[10] DK8 Ex. 6.

[11] Bernal Ex. 2.

qualified ethnic minority candidates assume minority ownership and day-to-day operational control of a Honda dealership, with an opportunity to thereafter acquire a controlling interest.

On September 29, 2011, to provide additional working capital to HBT JV, DK8 lent $1 million to HBT JV, evidenced by a Promissory Note made payable to DK8 (the "***DK8 Note***").[12]

### B. Bernal Investment in HBT JV in December 2012

On December 27, 2012, Bernal purchased Coffeen's 48% membership interest in HBT JV for $2.592 million. The following organizational chart depicts the relationship of Debtors HBT JV and DK8 with Bernal, Schnitzer, and HBT Land from December 27, 2012 through the present:



---

[12] DK8 Ex. 7.

To fund his acquisition of Coffeen's 48% membership interest in HBT JV, Bernal paid Coffeen $25,000 in cash from his own funds and borrowed the remaining $2.567 million from DK8, evidenced by a promissory note executed by Bernal and made payable to DK8 (the "***Bernal Note***").[13]  There are no required periodic principal or interest payments due under the Bernal Note. Rather, the Bernal Note is payable from HBT JV distributions to Bernal.  Bernal expressly authorized and directed HBT JV to send all of his distributions, if any, from HBT JV directly to DK8 for application to the Bernal Note.  The Bernal Note specifically provides, in part:

> [Bernal] hereby irrevocably agrees that [HBT JV] shall deduct from Distributions otherwise due [Bernal] from HBT JV and pay over directly to [DK8] any amounts due pursuant to this Note as Mandatory Prepayments.  Further, following the dissolution of [HBT JV], [Bernal] hereby irrevocable agrees that [HBT JV] shall, upon request of [DK8], withhold from [Bernal] any and all amounts that may from time to time thereafter be owing by [HBT JV] to [Bernal] and pay the same directly to [DK8] for application against this Note.[14]

To secure repayment of the Bernal Note, Bernal granted DK8 a Security interest in Bernal's membership interest in HBT JV. [15]

Bernal also signed the following documents when he acquired his 48% membership interest in HBT JV:

     i.     Second Amended and Restated Company Agreement of HBT JV dated December 27, 2012 (the "***LLC Agreement***");[16] and

     ii.    Transfer Agreement and Related Matters Regarding HBT JV LLC dated December 27, 2012 (the "***Transfer Agreement***").[17]

---

[13] Bernal Ex. 4; DK8 Ex. 9.

[14] Bernal Ex. 4; DK8 Ex. 9.

[15] This document was not offered into evidence at the Specific Performance trial but it has been referred to several times by the parties and its existence does not appear to be disputed.

[16] Bernal Ex. 1; DK8 Ex. 5.

[17] Bernal Ex. 3; DK8 Ex. 10.

Pursuant to the LLC Agreement, Bernal and DK8 agreed to make Schnitzer the sole "Manager" of HBT JV, with broad management rights, including (for example, and with certain limitations) the right to (a) prosecute and defend lawsuits, (b) engage employees, attorneys, and contractors, (c) borrow money, (d) sell and dispose of company assets, and (e) enter into transactions with affiliates.[18] Bernal, on the other hand, was named the "Dealership Manager" pursuant to section 5 of the Dealership Agreement, with authority to make all decisions regarding ordinary course transactions with respect to Dealership operations.

The Transfer Agreement between DK8 and Bernal provided each member of HBT JV the right to purchase the other member's interest in HBT JV under certain circumstances. As relevant to the Specific Performance Counts in this Adversary Proceeding, section 4.3 of the Transfer Agreement provides, in essence, if HBT JV receives an offer (a "***Third-Party Offer***") to purchase all or substantially all its assets, and one member (in this case, DK8) wants HBT JV to accept the Third-Party Offer, and the other member (here, Bernal) does not want HBT JV to accept the Third-Party Offer, then the non-consenting member (Bernal) has the right to withhold his consent to the Third-Party Offer, and instead seek to purchase the membership interest in HBT JV owned by the consenting member (here DK8). In other words, if Bernal elects to purchase DK8's membership interest, he must purchase DK8's membership interest in HBT JV on the same terms and conditions as the Third-Party Offer, and the purchase price of DK8's membership interest must be equal to the distribution DK8 would have received if HBT JV had accepted the Third-Party Offer, paid its creditor claims in full, and distributed the remaining funds to its members pursuant to the terms of the LLC Agreement, Transfer Agreement, the Bernal Note, and other

---

[18] Bernal Ex. 1; DK8 Ex. 5.

8

governing documents. In addition to the express terms of the Bernal Note authorizing HBT JV to re-direct Bernal distributions to DK8 for application to the Bernal Note, Article V(c) of the Transfer Agreement expressly recognizes that amounts due under the Bernal Note must be paid in calculating distributions available in an HBT JV liquidation.[19]

### C.    HBT JV Operations Under Schnitzer and Bernal

Both Bernal and Schnitzer testified that initially, their relationship was cordial as the parties worked together. During 2014 and into 2015, however, Schnitzer became dissatisfied with the operating performance of the Dealership. Bernal, on the other hand, testified that the operating performance of the Dealership during that time period was satisfactory from his perspective. As will be addressed in more detail below, Schnitzer's testimony on the operational performance of the Dealership was more credible and persuasive than the testimony of Bernal. In any event, in August 2015, Schnitzer, Bernal, and representatives of Honda had a meeting to review and discuss the operational performance of the Dealership. Following that meeting, Schnitzer decided that he wanted to get out of the Honda business and sell DK8's 52% membership interest in HBT JV and HBT Land's interest in the Real Estate. Therefore, in or about August 2015, Schnitzer informed Bernal of DK8's and HBT Land's desire to sell their respective assets. Schnitzer encouraged Bernal to look for capital or other investor or partner opportunities to acquire DK8's membership interest in HBT JV and the Real Estate from HBT Land. Both Schnitzer and Bernal testified that Schnitzer assisted Bernal with his efforts to find another investor or partner to purchase the Dealership and Real Estate. In addition, on September 3, 2015, Schnitzer sent to Bernal a summary

---

[19] Technically, this subsection, standing alone, does not apply to the present dispute because it involves a purchase price payable *to* Bernal, not a purchase price payable from Bernal to DK8.

of DK8's investment in the Dealership and HBT Land's investment in the Real Estate to assist Bernal with his search for a potential investor or partner.[20]

Unbeknownst to Schnitzer, on or about September 24, 2015, Bernal and others, including an entity by the name of Enterprise Financial Group, Inc., engaged legal counsel to represent each of them in regards to:

> (1) the purchase of the HOB Dealership located in Burleson, Texas currently owned by HBT JV, LLC; (2) the purchase of the real estate and Improvements located at 632 N. Burleson, Burleson, Texas 76028 currently owned by HBT Land, LLC ("Real Estate"); (3) demand for an accounting of HOB's operations; and (4) any litigation and legal claims resulting for the purchase of the HOB Dealership and Real Estate and/or accounting of HBT JV, LLC's operations, (the "Subject Legal Matter").[21]

In the meantime, DK8 and HBT Land, acting through Schnitzer, began to seek potential interested parties to purchase the Dealership assets and Real Estate. Although Schnitzer did not disclose the identity of potential interested parties with whom he was negotiating, Schnitzer did continue to apprise Bernal of his efforts to negotiate with various unnamed acquisition prospects.

### D. The John Eagle Offer in October 2015

One such prospect with whom Schnitzer was negotiating was Mr. John Eagle ("*Eagle*"). Eagle, who owns several dealerships, including several Honda dealerships, contacted Schnitzer about the potential availability of the Dealership and Real Estate. Schnitzer's and Eagle's discussions and negotiations ultimately resulted in an October 7, 2015 letter of intent (the "*John Eagle Offer*")[22] from John Eagle Lincoln-Mercury, LLP ("*John Eagle*"). The John Eagle Offer

---

[20] Bernal Ex. 14.

[21] HBT Land Ex. 47.

[22] DK8 Ex. 12.

sought to purchase substantially all of HBT JV's Dealership assets and HBT Land's Real Estate.

Key terms of the John Eagle Offer for the HBT JV Dealership assets included:

> $7,866,349 for the "Goodwill, Customer Lists, Records and Miscellaneous Inventories" (the "**_Blue Sky Price_**");

> An additional amount for new cars, used cars, parts and other assets to be determined by a third party inventory at closing; and

> A closing date not later "than sixty (60) days from the effective date of the APA; provided, however, in the event that Buyer has not yet received the approval of Honda … Buyer may elect to exercise an option to extend the Closing for an additional thirty (30) days."

Key terms of the John Eagle Offer for HBT Land's Real Estate included:

> $17 million for the Real Estate; and

> No financing contingency.

The John Eagle Offer was also conditioned upon the simultaneous closing of the purchase of the Dealership assets from HBT JV and the purchase of the Real Estate from HBT Land. In addition, the John Eagle Offer required John Eagle to enter into a formal asset purchase agreement with HBT JV for its Dealership assets (the "**_Eagle APA_**") and a formal purchase agreement with HBT Land for its Real Estate (the "**_Eagle RE Contract_**") within fifteen days of the date of the John Eagle Offer. The John Eagle Offer further provided that either party could—for any or no reason— elect at any time prior to the execution and delivery of the Eagle APA and the Eagle RE Contract to terminate discussions and negotiations without liability or obligation to the other party. In addition, the John Eagle Offer specifically referenced and was subject to "any right of first refusal or purchase rights held by Victor Bernal."[23]

---

[23] DK8 Ex. 12.

### E. The DK8 Offering Notice to Bernal

Schnitzer caused both HBT JV and HBT Land to execute the John Eagle Offer, which recognized and was subject to Bernal's buy-sell rights in the Transfer Agreement. Then, on October 9, 2015 at approximately 11:59 a.m., Schnitzer, as president of DK8, sent to Bernal a cover letter attaching the John Eagle Offer, together constituting an "Offering Notice" (the "*Offering Notice*")[24] required under Section 4.3 of the Transfer Agreement, thereby triggering Bernal's rights under Section 4.3 of the Transfer Agreement. The Offering Notice requested Bernal to either "consent to the sale as outlined in the attached offer or to purchase [DK8's] ownership in HBT JV LLC" and noting that "[t]his election must be made by you in writing to us no later than 15 days from the date hereof." From this point forward, confusion, misunderstanding, ambiguity, and gamesmanship between the parties began that culminated with the litigation now before the Court.

About five hours after DK8 sent Bernal the Offering Notice that triggered Bernal's rights under Section 4.3 of the Transfer Agreement, Bernal sent Schnitzer an email attaching a *Confidential Non-Binding Letter of Intent Concerning Proposed Purchase and Sale* (the "*Bernal Letter of Intent*") for Bernal's proposed purchase of either DK8's membership interest in HBT JV "and/or" HBT JV's assets for $8 million and the Real Estate for $17,002,428.[25] By its terms, the Bernal Letter of Intent is confusing, at best.[26] Schnitzer was confused not only by the content of the Bernal Letter of Intent, but also because the Bernal Letter of Intent was sent by Bernal approximately five hours *after* DK8 had sent the Offering Notice to Bernal.

---

[24] Bernal Ex. 5; DK8 Ex. 13.

[25] Bernal Ex. 19; DK8 Ex. 14.

[26] For example, in a provision labeled "Purchase Price of Company," the Bernal Letter of Intent proposed that Bernal pay $8 million for DK8's membership interest "and/or" the Dealership assets.

It is clear from the evidence that the Offering Notice and the Bernal Letter of Intent were two ships passing in the night and had nothing to do with one another. Rather, it appears that the Offering Notice and the Bernal Letter of Intent were two unrelated simultaneous offers being sent by DK8 and Bernal, respectively. The timing of these offers both being lodged on October 9, 2015 explains some of the confusion regarding subsequent communications between Bernal and Schnitzer. In any event, the Bernal Letter of Intent was never accepted by Schnitzer, DK8, HBT Land, or HBT JV.

On October 17, 2015, Bernal asked Richard F. Stone ("*Stone*"), CFO for Park Place Motorcars, Limited, to email him a "breakdown of the payout" of the John Eagle Offer to enable Bernal to analyze his options under the Offering Notice and to determine the approximate purchase price he would have to pay to acquire DK8's 52% membership interest under the Transfer Agreement.[27] Bernal reiterated his request on October 20, 2015.[28] That same day, Stone provided Bernal with a "summary overview of net proceeds distributable from a potential sale transaction" (the "*Stone Waterfall Analysis*").[29]

The Stone Waterfall Analysis first provided a broad disclaimer that it was merely a preliminary and summary overview and was not intended to reflect the actual purchase price of DK8's membership interest under a completed transaction. The Stone Waterfall Analysis then provided the hypothetical liquidation analysis required by Section 4.3(c) of the Transfer Agreement, utilizing the terms of the John Eagle Offer and assuming an election by Bernal to purchase DK8's membership interest in response to the John Eagle Offer. The Stone Waterfall

---

[27] Bernal Ex. 22.

[28] *Id.*

[29] Bernal Ex. 23; DK8 Ex. 15.

Analysis *estimated* a cash payment to DK8 of *approximately* $9.1 million. Again, that estimated, preliminary, approximate payment reflects both (a) DK8's base equity distribution, and (b) repayment of the Bernal Note.

Meanwhile, after he received the Offering Notice, Bernal testified that he had several conversations with Eagle in October through early November 2015 to discuss how Eagle might become a partner with Bernal or how Bernal might remain associated with the Dealership. Both Bernal and Schnitzer testified that Schnitzer encouraged Bernal to have such discussions with Eagle and Schnitzer specifically testified, credibly, that between October 22, 2015 and November 6, 2015 he was "trying to help [Bernal] do a deal with John Eagle" in the hopes that Bernal and Eagle might reach an agreement to acquire the Dealership and Real Estate.

At some point during his meetings and discussions with Eagle, Bernal and two of the Dealership's managers (one of which was Chris Wilson), met with Eagle. What happened at that meeting is disputed. According to Eagle, Wilson—in the presence of Bernal—asked Eagle to (i) withdraw the John Eagle Offer to DK8 and HBT Land, (ii) allow Bernal to buy out DK8 at a lower price, and (iii) come back and negotiate with Bernal to buy back into the Dealership at a lower price after Bernal obtained control. Specifically, Eagle testified at his deposition:

> Q. (BY MR. LOCKHART) When you were negotiating -- when you were having discussions with Victor Bernal in October of 2015 about doing a deal, did he ever tell you that he had exercised his right of first refusal?
>
> A. No.
>
> . . .
>
> Q. (BY MR. LOCKHART) At any point that you were having discussions with Mr. Bernal about doing a deal with him, did he ever ask you to terminate your offer for —that you had made to Mr. Schnitzer?
>
> A. I was in a meeting that Victor had asked for to meet two of his managers. I only remember one of them's name, Chris, who did all the talking. And Chris asked me,

he said, What would you— why don't you drop your contract or your offer to Ken and then Victor can buy it cheaper and then we'll come back to you? And Victor didn't say anything. And I told him I was not interested, that's collusion.[30]

Bernal, on the other hand, disputes that conversation took place. Because Eagle did not testify live, the Court is not able to determine whether Eagle or Bernal is more credible concerning the alleged conversation. As a result, the Court gives no weight to the Eagle deposition testimony in any aspect of the Specific Performance Counts.

### F. The Bernal Reply Notice

On October 22, 2015, Bernal sent DK8 a "Reply Notice" (the "***Reply Notice***"),[31] which stated in part:

> I do not consent to the Sale of HBT JV, LLC to John Eagle Lincoln Mercury, LLC and I am hereby electing to purchase all of Selling Member's membership interest (52%) in HBT JV, LLC consistent with the terms set forth in Section 4.3(a) and (c) of the Transfer Agreement and consistent with the terms of any other relevant agreement(s).
>
> . . .
>
> [T]he Purchase Price will be the total economic benefit of $9,085,214,00, with any necessary adjustments determined by and in accordance with a forensic audit to confirm the effective repayment amount toward the ($2,567,000.00) Bernal Note (as defined in the Transfer Agreement). Please note the reference to attached Exhibit "A" [the Stone Waterfall Analysis], prepared by Rick Stone, the Selling Member's CFO, regarding the economic benefit to be derived from a proposed sale under the John Eagle Offer.
>
> By this Reply Notice, please be advised that I am willing to close the purchase of the Selling Member's membership interest in HBT JV, LLC upon the same terms and conditions as provided in the John Eagle Offer, consistent with the terms in the Transfer Agreement.
>
> . . . .

---

[30] Eagle Dep. 91:6–92:4, February 16, 2016.

[31] Bernal Ex. 6; DK8 Ex. 17.

I have requested legal counsel to commence drafting a Membership Interest Purchase Agreement and a Purchase and Sale Agreement for the real property, and will forward drafts to you and your legal counsel as soon as possible.[32]

According to Bernal, Schnitzer never told him that the Reply Notice was ineffective for any reason. Schnitzer, on the other hand, testified that he emailed Bernal on October 22, 2015 shortly after receipt of Bernal's Reply Notice. Schnitzer's email stated "[w]e should talk tomorrow but this is not what we talked about."[33] The next day, on October 23, 2015, Bernal responded "[t]his was simply to stop the clock. Hopefully I can get a term sheet from John today for review."[34] In addition to the above email exchange, Schnitzer testified that he spoke with Bernal and told him that his Reply Notice did not match the John Eagle Offer. Schnitzer further testified that on October 23, 2015, following conversations with Bernal, Schnitzer sent two draft letters for Bernal to sign whereby Bernal would withdraw his Reply Notice and Schnitzer would extend the time within which Bernal would be required to make his Section 4.3 election under the Transfer Agreement.[35]

Schnitzer testified, credibly, that he sent Bernal these letters because it was clear that Bernal was not prepared to close a transaction and that Bernal wanted more time to negotiate a potential deal with Eagle. In addition, the cover email from Schnitzer to Bernal simply states "Here you go,"[36] which certainly supports Schnitzer's testimony that he sent the first draft letter following a conversation with Bernal. Schnitzer testified further, credibly, that he sent the second revised letter following another conversation with Bernal because Bernal told Schnitzer that Bernal's counsel

---

[32] *Id.*

[33] Bernal Ex. 25; DK8 Ex. 19.

[34] *Id.*

[35] Bernal Exs. 26 and 28.

[36] Bernal Ex. 26.

had some changes to the first draft letter, so Schnitzer sent the second letter, incorporating the comments from Bernal's counsel. Again, Schnitzer's testimony is further corroborated by the email from Schnitzer to Bernal wherein Schnitzer stated "I just tried to call you. Please call me."[37] Then, approximately an hour after Schnitzer sent Bernal that email, Schnitzer sent the second revised letter. The documentary evidence supports Schnitzer's testimony, and Schnitzer's testimony was credible on this issue. Bernal's testimony, on the other hand, that Schnitzer was trying to trick Bernal into withdrawing the Reply Notice was not credible. In any event, the evidence established that Bernal did not sign either of the draft letters.

Meanwhile, the evidence established that Bernal was negotiating with Eagle about a potential partnership from October 22, 2015 through early November 2015. In that regard, on November 2, 2015, Bernal emailed Schnitzer: "We were under the impression that you were going to talk to John [Eagle] and get us a guaranteed number prior to closing that way we would know exactly how much we would owe."[38] Schnitzer replied a few minutes later: "Who is we? I am not talking to John. You exercised your right of first refusal and I understand that you are buying the Dealership."[39] On the one hand, this email chain seems to suggest that Schnitzer recognized *some* type of election by Bernal. On the other hand, Schnitzer specifically referred to Bernal's election to buy "the Dealership," a defined term in the introductory paragraph of the John Eagle Offer concerning HBT JV's assets only. Nowhere in his email did Schnitzer refer to the Real Estate, which was a separately defined term in the John Eagle Offer. Therefore, at a minimum,

---

[37] Bernal Ex. 27.

[38] Bernal Ex. 34.

[39] *Id.*

17

Schnitzer's email undercuts Bernal's allegation that Schnitzer never told him that the Reply Notice did not apply to the Real Estate.[40]

On November 6, 2015, Bernal's counsel emailed to Schnitzer's counsel Bernal's proposed *Membership Interest Assignment Agreement* referenced in the Reply Notice (the "***Membership Interest Purchase Agreement***") and *Agreement for Sale and Purchase of the Land* (the "***Real Estate Contract***").[41] The Membership Interest Purchase Agreement and Real Estate Contract contained, among other provisions, the following conditions and requirements to Bernal's obligation to purchase DK8's membership interest in HBT JV and HBT Land's interest in the Real Estate:

> A downward adjustment, defined as the "Promissory Note Offset," to the amount owed to DK8 under the second component of the purchase price—repayment of the Bernal Note—based on the "forensic audit" referenced in the Reply Notice;
>
> A binding determination by an accountant (essentially a binding arbitrator) of the amount due under the Bernal Note based on "distributions which have been or should have been previously distributed" to Bernal;
>
> A nine-page list of documents DK8 was required to produce to the forensic audit accountant to assist him in determining the Promissory Note Offset;
>
> An eight-page list of "Representations and Warranties" required from DK8 relating to, among other things, HBT JV's financial statements, permits, taxes, insurance, employee benefits, and material contracts—documents and information to which Bernal already had access as the Dealership Manager and as a member of HBT JV;
>
> The Real Estate Contract contained a "Financing Contingency" that rendered the entire transaction contingent on Bernal's ability to obtain "desirable" financing; and
>
> A Release that arguably would have released both the Bernal Note and the DK8 Note.

---

[40] Bernal Ex. 5; DK8 Ex. 13.

[41] DK8 Ex. 22.

Schnitzer testified that when he reviewed the proposed transaction documents sent by Bernal's counsel on November 6, 2015, "I was mad, maybe is the best way to say it." When asked why, Schnitzer testified:

> Because it was so far from the John Eagle Offer and it was a—I felt like I was being had, and I didn't like it. When you get into all the forensic accounting stuff and the eight pages of warranties and reps and all the other things and wasn't going to pay the note and all that, it just was disingenuous. It just really set a tone. When I had been trying to, you know, do the right thing and try to help Victor as much as I can, this really changed the way I felt about the transaction and Victor.

DK8 immediately informed Bernal that the new conditions of Bernal's Membership Interest Purchase Agreement and Real Estate Contract were unacceptable to DK8. The parties then scheduled a meeting for November 17, 2015. Schnitzer, Bernal, and their respective counsel attended the November 17 meeting. Schnitzer testified that during this meeting, he and his counsel made it "crystal clear" to Bernal and his counsel that the Reply Notice was not effective. In addition, Schnitzer testified that Bernal's counsel threatened him with litigation. Over the next six weeks, the parties exchanged various proposals designed to settle their disputes and to avoid expensive and protracted litigation. Those discussions, however, broke down in late December 2015, and on January 11, 2016, Bernal filed his Original Petition, initiating the State Court Lawsuit.

In late 2016 into early 2017, the parties again attempted to settle their disputes and exchanged revised settlement draft documents and settlement communications.[42] Such additional settlement attempts by the parties were not successful.

---

[42] *See, e.g.*, DK8 Exs. 27, 28, 29; Bernal Ex. 53.

## IV.  OBSERVATIONS ABOUT THE WITNESSES

Bernal, Stone, and Schnitzer testified live in Court during the trial on the Specific Performance Counts.   All three witnesses appeared to be sincere, likeable, and *generally* credible, with exceptions to Bernal's testimony as specifically noted herein.  Where the testimony of Bernal and Schnitzer conflicted, the Court considered their demeanor and also looked to the other evidence to determine who was more credible.

Stone had a firm grasp of the dealership's finances, the monetary obligations owed between the various parties, and the history and structure of Bernal's 48% ownership of HBT JV.  Stone was unflappable under cross examination and explained with clarity the details of the various financial analyses he prepared for Schnitzer and Bernal.

Schnitzer began his career in the auto dealership profession in 1987 and he currently owns thirteen dealerships that employ over 2,200 employees.  His dealerships sell many different automobiles including Mercedes-Benz, Porsche, Lexus, Jaguar, Volvo, Infiniti, Lotus, McLaren, Rolls Royce, Bentley, Maserati, Bugatti, Smart Cars, Honda, and others.  He owns one of the two automobile dealerships that have won the Malcolm Baldrige Quality Award.[43]  In addition, his Park Place dealership has been rated in the top five of the *Dallas Morning News* "Top 100 Places to Work Survey" for the past several years.  It is clear that Schnitzer is a very successful businessman in the retail automobile industry.  It is equally clear, however, that Schnitzer was disappointed with the operating performance of HBT JV and he was not satisfied with the direction of the Dealership.  The evidence also established that sometime during 2015, the business relationship between Schnitzer and Bernal began to deteriorate.

---

[43] The Malcolm Baldrige Quality Award is an award presented annually by the President of the United States to companies that meet certain standards in performance excellence.

Despite the deteriorating relationship between Schnitzer and Bernal, the Court finds that, based on the evidence, Schnitzer had a sincere desire to help Bernal acquire the Dealership and Real Estate. The Court further finds that based on the evidence, Schnitzer acted in good faith throughout the disputes related to the Specific Performance Counts—or at the very least he did not act in bad faith. Although Schnitzer was impeached about his prior testimony given at the temporary-injunction hearing held in January 2016 in the State Court, he explained, credibly, that his subsequent review of emails and documents assisted his recollection about what actually had happened during the time periods relevant to the Specific Performance Counts.

Bernal likewise appears to be a hard-working businessman with a compelling success story. Bernal began working in the automobile industry over twenty years ago when he was eighteen years old. Bernal testified that he began as a sales consultant and has worked in every department in all facets of several automobile dealerships since his first job. For example, Bernal has worked as a sales consultant, finance manager, finance director, sales manager, general sales manager, and as general manager for various dealerships that sold several makes of automobiles including Hyundai, Kia, Toyota, Nissan, and Honda. In 2011, Schnitzer and Coffeen hired Bernal to be the general sales manager of the Dealership. Thereafter, in December 2012, Bernal became a 48% member of HBT JV and the Dealership Manager. As Dealership Manager, he had authority to make all decisions regarding ordinary course transactions with respect to Dealership operations, including sales and finance.

Bernal testified that through his determination, hard work, and persistence over the past twenty years, he has tried to position himself to achieve his life-long goal of owning his own dealership. Bernal clearly has a compelling and admirable story and a sincere desire to own the Dealership. Through his testimony and other evidence, however, it is clear that Bernal did not

have a firm grasp or understanding of the Dealership Agreement, LLC Agreement, Transfer Agreement,[44] or the Bernal Note.  Nor did Bernal have a firm grasp or understanding of the Offering Notice or the Reply Notice that he signed or authorized to be sent on his behalf.  Nor did Bernal have a firm grasp or understanding of the financial information provided to him by Schnitzer and Stone as part of his due diligence in seeking to exercise his rights under the Transfer Agreement or while seeking other potential partners to acquire the Dealership.  Finally, it is clear that Bernal does not have an in-depth understanding of the legal documents, financial terms, or the difference or distinction between separate legal entities and persons such as those involved in this dispute—namely, DK8, HBT JV, HBT Land, and Schnitzer individually.  The Court concludes that Bernal's imperfect understanding contributed, in material part, to his conflicts with Schnitzer and the consequences of the actions he took or authorized his counsel to take relevant to the disputes in the Specific Performance Counts.

In the end, the Court cannot resolve this dispute based on Schnitzer's business accolades and awards at other dealerships, or on Bernal's sincere, but unfulfilled, desire to own *this* Dealership and Real Estate.  Instead, the Court must resolve this dispute based on the law and the relevant evidence.  And in most commercial litigation disputes, the relevant and controlling evidence and facts often lie in the documents.

---

[44] Although the Transfer Agreement is a critical document, Bernal admitted in his cross-examination that he did not really understand all the terms in the agreement nor has he read the entire agreement.

## V.  LEGAL ANALYSIS

**A.  Bernal is not entitled to specific performance of his preferential right to purchase the Dealership.**

**1.  Bernal did not properly exercise his preferential right under the Transfer Agreement.**

To properly exercise his preferential right under the Transfer Agreement, Bernal had to unequivocally, unambiguously, and unconditionally accept the price and all terms and conditions in the Offering Notice related to DK8's membership interest in HBT JV.  Bernal failed to do this because he included in his Reply Notice (i) a fixed price for DK8's membership interest, and (ii) an adjustment to the fixed price pursuant to a "forensic audit" to determine the "effective repayment amount" of the Bernal Note.  As a result, because he did not properly exercise his preferential right, Bernal cannot seek specific performance of a contract that was never formed.

A preferential right gives a party the first opportunity to purchase the property that is subject to the preferential right if and when an owner of the property decides to sell *that* property.[45] Before a preferential right is triggered, a preferential rightholder cannot compel the sale of the property subject to the preferential right, nor may the rightholder first negotiate with the seller.[46] Rather, once the preferential right is triggered, the rightholder can only either accept or reject the offer concerning the property that is subject to the preferential right.[47]

To exercise the preferential right, the rightholder's acceptance must:  (1) comply with the offeror's required method; (2) be positive, unequivocal, unambiguous, and unconditional; and (3)

---

[45] *See, e.g., Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied); *City of Brownsville v. Golden Spread Elec. Co-op., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied); *Navasota Res., L.P. v. First Source Tex., Inc.*, 249 S.W.3d 526, 532 (Tex. App.—Waco 2008, pet. denied).

[46] *Abraham Inv. Co.*, 968 S.W.2d at 524–25.

[47] *Id.* at 524.

accept all terms of the offer.[48]   There is no acceptance where a responsive letter includes a modification to the terms of the offer.[49]

Under these standards, Bernal did not properly exercise his preferential right to acquire DK8's membership interest because his Reply Notice (i) did not accept the adjustable price term of the Dealership that was included in the John Eagle Offer; and (ii) added a requirement that the "Purchase Price" would change based on "any necessary adjustments determined by and in accordance with a forensic audit to confirm the effective repayment amount toward the ($2,567,000.00) Bernal Note (as defined in the Transfer Agreement)."[50]   As such, the Reply Notice was either (i) an unambiguous rejection and counteroffer, or (ii) ambiguous.   Either way, Bernal's Reply Notice was not a positive, unequivocal, unambiguous, and unconditional acceptance.[51]   The Reply Notice failed in at least three independent respects.

First, Bernal stated in the third paragraph of his Reply Notice what the price "will be"— and it was not the fluctuating price provided in the John Eagle Offer, which depended on the value of the Dealership assets at closing.   Instead, Bernal provided a fixed price of $9,085,214.00, based on the Dealership's value during a particular snapshot in time.   Bernal contends that the "will be" language he used in his Reply Notice is merely predictive language rather than a command.   But that term, when considered in the context of the "forensic audit" and "effective payment amount"

---

[48] See, e.g., *Ideal Capital Ltd. P'ship v. C & C N. Am., Inc.*, No. CIV.A.H-08-2239, 2009 WL 1257057, at *3 (S.D. Tex. May 4, 2009); *Austin Presbyterian Theological Seminary v. Moorman*, 391 S.W.2d 717, 720 (Tex. 1965); *City of Brownsville*, 192 S.W.3d at 880; *MRC Permian Co. v. Three Rivers Operating Co.*, No. 05-14-00353-CV, 2015 WL 4639711, at *14 (Tex. App.—Dallas Aug. 5, 2015, pet. denied).

[49] See, e.g., *Johnston v. Sw. Dining Servs.*, No. 05-95-01843-CV, 1999 WL 637217, at *3 (Tex. App.—Dallas Aug. 23, 1999, no pet.).

[50] Bernal Ex. 6; DK8 Ex. 17.

[51] Because the Court finds that the fixed-price, forensic audit, and "effective repayment" language made the Reply Notice ineffective to accept the Offering Notice, the Court need not decide whether the closing terms in the Reply Notice likewise made it ineffective to accept the Offering Notice.

language that immediately follows it, reveals that "will be" is indeed a command, not a mere prediction. At best for Bernal, whether "will be" is predictive or a command is ambiguous.

Second, the only "necessary" adjustments to the commanded purchase price are determined pursuant to a "forensic audit." Bernal and Schnitzer both testified that they did not know what the term "forensic audit" meant in the Reply Notice. But the inclusion of a "forensic audit"[52] in his Reply Notice is not, as Bernal suggests, just a "request" that Bernal have an opportunity to inspect the books and records of HBT JV to determine whether he was or had been entitled in the past to any distributions from HBT JV that could or should have reduced the balance owing on the Bernal Note. The John Eagle Offer contained no such requirement for a "forensic audit" to determine the purchase price. This language either (i) unambiguously contradicted the Offering Notice, or (ii) added a highly charged and ambiguous term in the Rely Notice. Either one is fatal to the Reply Notice.

Third, the forensic audit was to "confirm the effective repayment amount toward" the Bernal Note. The term "effective repayment amount" further constitutes a clear rejection of the Offering Notice, or best case scenario for Bernal, constitutes an ambiguous term. Either way, including the term in the Reply Notice is fatal and prevents the formation of a contract.

---

[52] Federal cases involving the term "forensic audit" reveals that the term almost always refers to an investigation of wrongdoing. *See, e.g., Adams v. Bank of Am.*, 475 F. App'x 526, 526–27 (5th Cir. 2012) (refusing to consider "forensic audit report" purporting to show defendants' violations of federal and state law because report was not introduced in trial court); *United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999) (district court's reliance on a forensic audit for its finding of loss in union embezzlement case was not clearly erroneous).

Despite the clear non-confirming and nonmatching language in his Reply Notice, Bernal makes three primary arguments in an attempt to save the effectiveness of the Reply Notice, none of which have merit.

First, Bernal argues that the fixed-price, "forensic audit," and "effective repayment" terms must be read in context, and those terms are "sandwiched" between other language in the Reply Notice that expressly adopts and accepts the terms and conditions of the John Eagle Offer. In support, Bernal relies on *MRC* for the proposition that requests for modification of an offer, inquiries as to its meaning, and comments (even complaints) about the offer do not vitiate an otherwise sufficient acceptance unless they purport to condition the acceptance on acquiescence to different terms.[53]

*MRC* is instructive, but distinguishable on the critical issue in dispute here. The preferential rightholders in *MRC* unequivocally and unambiguously exercised their preferential right with respect to five properties by checking a box in an election form sent by the seller. When sending the election form to the seller, the rightholders *asked* in their cover letter for the seller to prepare a separate purchase agreement for *different* properties.[54] The court likened the request in the cover letter to the following example:

> A offers to sell specified hardware to B on stated terms. B replies: "I accept your offer; ship in accordance with your statement. Please send me also one No. 5 hand saw at your list price." The request for the saw is a separate offer, not a counter-offer.[55]

---

[53] *MRC Permian Co. v. Three Rivers Operating Co.*, No. 05-14-00353-CV, 2015 WL 4639711 (Tex. App.—Dallas Aug. 5, 2015, pet. filed) (mem. op.) (applying New Mexico law).

[54] *Id.* at *9.

[55] *Id.* at *10 (citing RESTATEMENT (SECOND) OF CONTRACTS § 61, ill. 2 (Am. Law. Inst. 1981)).

The *MRC* court noted, in contrast, that "[a]ny expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer."[56]

The nonmatching language in the Reply Notice is a far cry from the *request* to buy *different* properties in *MRC*, or the *request* for a *separate* handsaw in the Restatement example. Nor is the nonmatching language an inquiry, comment, or complaint. The nonmatching language in the Reply Notice instead is a *command* ("will be") for a *fixed* purchase price for the *very same* membership interest described in the rest of the Reply Notice, with "necessary adjustments" only pursuant to a "forensic audit" to determine an "effective repayment amount" of the Bernal Note. The Reply Notice is much more like the Corbin on Contracts example of an expression of assent that changes the terms of the offer in a material respect.

Second, Bernal argued at trial that the nonmatching language in the Reply Notice was merely an extraneous, innocuous statement because repayment of the Bernal Note could not possibly have an effect on the purchase price for DK8's membership interest. According to this theory, the purchase price under the Transfer Agreement is based on what DK8 would receive in a liquidation of HBT JV, and since repayment of the Bernal Note is not expressly mentioned in the LLC Agreement, the Transfer Agreement, the Offering Notice, or the Reply Notice—the four documents Bernal claims govern the preferential right—the Bernal Note would not be paid in an HBT JV liquidation. This theory simply does not work for Bernal. The Bernal Note is mentioned more than once in the Transfer Agreement, and Bernal represented in section 6.4(a) that the Transfer Agreement "and each other instrument executed in connection herewith" (which would

---

[56] *Id.* (citing JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.28 (Rev. ed. 1993)).

include the Bernal Note) is a valid and generally enforceable obligation of Bernal.[57] The term of the Bernal Note that requires HBT JV distributions to be redirected to DK8 is akin to a subordination or inter-creditor agreement, and those agreements are enforceable under Texas law and under the Bankruptcy Code.[58] Repayment of the Bernal Note, therefore, would be considered in any liquidation of HBT JV and is therefore embedded in the purchase price of DK8's membership interest.[59] But even if Bernal wins on this point, he still loses: If Bernal is correct that repayment of the Bernal Note is *not* part of the Purchase Price under the Transfer Agreement, he *made* it an express deduction to the Purchase Price by his Reply Notice and therefore changed a material term of the Offering Notice.

Third, Bernal argues that DK8—by its conduct after it received the Reply Notice—waived the right to argue that the Reply Notice was ineffective to create a binding agreement. The applicable case law, however, makes clear that a lapsed option contract cannot be revived by a subsequent purported waiver.[60]

Even if the legal theory of waiver were available to Bernal, the Court finds and concludes that there was no waiver by DK8. As found above, Schnitzer emailed and talked to Bernal to tell

---

[57] In support of his argument on the Statute of Frauds, Bernal argued that all documents executed at the same time, as part of one continuous transaction, should be considered together. The Bernal Note, the Transfer Agreement, and LLC Agreement were all signed at substantially the same time on December 27, 2012.

[58] *See* 11 U.S.C. § 510(a); *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 527 (5th Cir. 2004) (under Texas law subordination agreements are enforceable in bankruptcy proceedings pursuant to § 510(a) to the same extent such agreements would be enforceable under applicable nonbankruptcy law).

[59] In support of this theory, Bernal also points to a narrower definition of "Purchase Price" in a December 18, 2015 draft membership purchase agreement sent by DK8's counsel to Bernal's counsel, which excluded the Bernal Note. *See* Bernal Ex. 46. Regardless of this language, the draft document still contemplated that the Bernal Note would be paid at the closing, as did the Transfer Agreement. A proposed change in how the document labeled payment of the Bernal Note is merely semantics and does not help Bernal. He was always required to pay the Bernal Note in connection with his purchase of DK8's membership interest in HBT JV.

[60] *See Voss Rd. Exxon LLC v. Vlahakos*, No. 01-10-00146-CV, 2011 WL 2623989, at *5–7 (Tex. App.—Houston [1st Dist.] June 30, 2011, no pet.) (mem. op.) (party could not use waiver to revive preferential right that was not exercised timely).

him his Reply Notice did not match the John Eagle Offer.  Included in those communications is an October 22, 2015 email from Schnitzer to Bernal stating that the Reply Notice was "not what we talked about."[61]  At trial, Bernal's counsel questioned why Schnitzer composed such an abrupt email when he could have had legal counsel ghost write a more legally descriptive description of why Bernal's Reply Notice did not match the John Eagle Offer.  The Court finds Schnitzer's reply email to be typical of a business-man-to-business-man email late in the evening.  Schnitzer also testified credibly that he still thought, at that point, that the parties were working toward a possible agreement, so he felt no need to fire off a lawyer-drafted critique of the Reply Notice.

Still looking for a waiver, Bernal also makes much of the fact that several draft documents—including the draft letters Schnitzer sent to Bernal to have Bernal withdraw his Reply Notice, and the later drafts of definitive documents—contained recitals to the effect that Bernal made his election.  Those draft, unsigned documents prove nothing other than no agreement was ever reached by the parties.  Certainly they do not give rise to a waiver, especially considering Schnitzer's prior communications to Bernal that the Reply Notice was ineffective.

> **2.** **Even if Bernal properly exercised his preferential right, Bernal's subsequent conduct eliminates his right to specific performance.**

On November 6, 2015, roughly two weeks after Bernal sent his Reply Notice, allegedly agreeing to match the price and all terms and conditions of the Offering Notice, Bernal's counsel emailed to DK8's counsel a proposed membership interest purchase agreement.[62]  That document demonstrates that Bernal did not intend to match the John Eagle Offer:

---

[61] Bernal 25; DK8 Ex. 19.

[62] DK8 Ex. 22.

Section 2.2(a) of the proposed agreement carries forward the identical fixed price in the Reply Notice and declares that Bernal "shall pay" that amount to DK8 to purchase its membership interest in HBT JV, less "applicable adjustments."

Section 2.2(c) calls for a "Promissory Note Offset," which is a binding determination by an accountant of the amount due under the Bernal Note based on "distributions which have been or should have been previously distributed" to Bernal. This setoff is the only "applicable adjustment" to the fixed purchase price. In effect, Bernal wanted to offset against the purchase price payable to DK8 his claims against Schnitzer, as Manager of HBT JV, thus ignoring the separate legal entities involved and the mutuality requirement for setoff.

Section 2.2(c) requires DK8 to provide a nine-page list of "Due Diligence Materials" to the forensic accountant to help him determine the Promissory Note Offset.

Section 3.1 contains an eight-page list of "Representations and Warranties" required from DK8 relating to, among other things, HBT's financial statements, permits, taxes, insurance, employee benefits, and material contracts—documents and information to which Bernal already had access as the Dealership Manager and a member of HBT.

Section 4.8 contains a Release that arguably would require DK8 to release both the Bernal Note owed by Bernal and the DK8 Note owed by HBT JV.

Section 5.1(a) requires DK8 to indemnify Bernal for, among other items, any breach of the representations or warranties set forth in section 3.1.

The fixed price and Promissory Note Offset provisions in the November 6, 2015 documents clearly were not part of the John Eagle Offer. And the stunningly broad "Due Diligence Materials," "Representations and Warranties," and related indemnities might be expected in a dealership asset sale by HBT JV but not in a sale of a membership interest by DK8. Indeed, the Transfer Agreement requires only that "Transfer Documents" be signed for a sale of the membership interest, which means "a legally sufficient assignment of the Membership Interest being sold free and clear of any and all liens or other encumbrances other than those imposed by the LLC Agreement or this [Transfer] Agreement together with covenants of special warranty."

The requirements contained in the November 6, 2015 proposed documents are inconsistent with the John Eagle Offer and are inconsistent with the Transfer Agreement itself.

Moreover, the fixed price and Promissory Note Offset provisions undermine Bernal's testimony at trial that he *wants* to pay the Bernal Note and merely was trying to figure out if any distributions had been applied to the Bernal Note. Instead, the November 6, 2015 drafts and the other direct and circumstantial evidence at trial overwhelmingly confirm that Bernal did not intend to match the John Eagle Offer, but instead, intended to find a way (through litigation or otherwise) to reduce the amount he would have to pay to acquire the Dealership and Real Estate.

Regardless of the legal theory used to describe this conduct, Bernal has lost his right to demand specific performance.

First, Bernal's conduct, which is inconsistent with performance on the terms of the John Eagle Offer, constitutes a waiver and abandonment of any right to specific performance. "The right to specific performance is one which may be waived or abandoned and abandonment may be inferred from the circumstances or the conduct of the parties showing an intention inconsistent with performance."[63] Here, by his actions, Bernal has refused to perform under the terms and conditions of the John Eagle Offer and has, therefore, waived and abandoned his right to seek specific performance.

Second, Bernal's actions constitute a repudiation of the parties' contract (assuming one had been formed) when he sent his Reply Notice. A contract may be repudiated by words or conduct

---

[63] *Hamon v. Allen*, 457 S.W.2d 384, 392 (Tex. Civ. App.—Corpus Christi 1970, no writ) (quoting *Kluck v. Leuschner*, 70 S.W.2d 768, 769 (Tex. Civ. App.—Waco 1934, writ ref'd)); *see also, e.g., SG/IP Ltd. v. Centers*, 121 F. App'x 546, 548 (5th Cir. 2004) (per curiam) (specific performance denied to option holder who failed to attend the closing and tender performance).

showing "a fixed intention to abandon, renounce and refuse to perform the contract."[64] On and after November 6, 2015, Bernal's actions and words indicated that he did not intend to perform pursuant to the Offering Notice. By failing to agree to the terms in the Offering Notice, Bernal repudiated the contract to purchase the Dealership, assuming a contract had even existed at that point in time.[65] Finally, although Bernal signed a more palatable form of purchase agreement a year and a half later,[66] that belated effort was far too late to rectify his prior repudiation, abandonment, and waiver.[67]

**B.** **Even if Bernal is entitled to specific performance with respect to the Dealership, Bernal cannot force the sale of the Real Estate owned by HBT Land**

Bernal's request for specific performance to purchase the Real Estate owned by HBT Land hinges on the threshold question of whether he properly exercised his preferential right. As explained above, he did not. In any event, Bernal's attempt to force HBT Land, a third party in which he has no interest, to sell its Real Estate to him as a "term and condition" of the sale of DK8's membership interest in HBT JV is unsupported by the Transfer Agreement and Texas law.

---

[64] *Panasonic Co., Div. of Matsushita Elec. Corp. of Am. v. Zinn*, 903 F.2d 1039, 1042 (5th Cir. 1990) (citing *Hauglum v. Durst*, 769 S.W.2d 646, 651 (Tex. App.—Corpus Christi 1989, no writ)); *Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex. Civ. App.—Dallas 1981, no writ); *see also, e.g.*, *White v. Harrison*, 390 S.W.3d 666, 672 (Tex. App.—Dallas 2012, no pet.) ("A repudiation is accomplished by a contracting party's words or actions that indicate he is not going to perform his contract in the future.").

[65] *See, e.g., El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (non-repudiating party can rescind contract).

[66] Bernal Ex. 53.

[67] *Griffith v. Porter*, 817 S.W.2d 131, 135 (Tex. App. – Tyler 1991, no writ) (repudiation can be timely retracted by notifying the other party of intent to perform).

    1.    **Bernal's limited preferential right is phrased solely in terms of the purchase of a membership interest in HBT JV and makes no mention of the Real Estate.**

The scope of a preferential right is determined by the agreement between the parties, the offer letter, and related terms and conditions of the third-party offer.[68]

Here, the Transfer Agreement is the only contract that defines the scope of Bernal's option, and that option relates solely to DK8's "Membership Interest" in the Dealership. The full title of the Agreement is "Transfer Agreement and Related Matters Regarding HBT JV LLC." Further, the Agreement is "by and between DK8, LLC, a Texas limited liability company, and Victor Bernal," the two members of HBT JV. It is true that Schnitzer also signed the Transfer Agreement to bind the "Holder Group Affiliates," but only with respect to the terms applicable to such persons. As explained below, there are no terms applicable to HBT Land.

Importantly, Section 4.3, which establishes Bernal's preferential right, is phrased solely in terms of a right to purchase a membership interest in HBT JV:

> Bernal can elect "either to (i) consent to the Sale or (ii) purchase or cause the purchase of all (but not less than all) of ***the Membership Interest*** then owned by [DK8], all in accordance with the following provisions of this Section 4.3."

> "On or before the expiration of the Reply Notice Period, [Bernal] shall deliver a Reply Notice to [DK8] indicating whether [Bernal] is electing to consent to the sale or if [Bernal] is electing to purchase ***the Membership Interest*** owned by [DK8] . . . ."

> "If [Bernal] elect[s] not to consent to the Sale and thus elect[s] to purchase ***the Membership Interest*** owned by [DK8], then . . . [DK8] shall sell all (but not less than all) of ***the Membership Interest*** owned by [DK8] to [Bernal]. . . ."[69]

---

[68] *See Startex First Equip., Ltd. v. Aelina Enters., Inc.*, 208 S.W.3d 596, 600 (Tex. App.—Austin 2006, pet. denied) ("Rights of first refusal are bargained-for contractual provisions, and their scope must be determined by interpreting the contractual language at issue."); *see also Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied); *City of Brownsville v. Golden Spread Elec. Co-op., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied).

[69] Bernal Ex. 3; DK8 Ex. 10.

Nowhere in Section 4.3, or anywhere else in the Transfer Agreement, is there any mention of a preferential right for Bernal to purchase anything other than DK8's membership interest, and there is absolutely no reference to the Real Estate or a right to purchase the Real Estate. That is why DK8's Offering Notice to Bernal referred solely to the purchase of its "ownership ***in HBT JV LLC***."[70] The Offering Notice makes clear that Bernal can either "consent to the sale" or "purchase our ownership in HBT JV LLC."

In addition, Section 4.3(c) of the Transfer Agreement sets out a precise formula for calculating the purchase price of DK8's membership interest. Section 4.3 provides a formula for converting the purchase of HBT JV's Dealership assets under the John Eagle Offer to Bernal's option to buy DK8's membership interest on the same terms and conditions as the Dealership asset sale. Bernal was required to buy DK8's membership interest at the price DK8 would have received if John Eagle bought HBT JV's Dealership assets as set forth in the John Eagle Offer, and HBT JV then liquidated and distributed the proceeds to its owners (Bernal and DK8) in accordance with their percentage ownership interests. The Real Estate is completely irrelevant to a calculation of the purchase price under Section 4.3.

Thus, under the plain language of the Transfer Agreement, Bernal has no preferential right to purchase the Real Estate.[71]

---

[70] *Id.*

[71] Because the Transfer Agreement does not give Bernal the preferential right to purchase the Real Estate, the Court need not decide whether the Statute of Frauds applies and whether DK8 pled the Statute of Frauds or should be permitted to amend its pleadings to assert that affirmative defense.

## 2. No Texas case has allowed a preferential rightholder to compel the sale of property not subject to the right.

To avoid the fact that Section 4.3 of the Transfer Agreement is phrased solely in terms of a purchase of DK8's membership interest, Bernal argues that purchase of the Real Estate is a "term and condition" of the purchase of DK8's membership interest. Bernal thus believes he can force HBT Land to sell the Real Estate to him because the John Eagle Offer also included a conditional offer to purchase the Real Estate. No Texas cases support Bernal's position.

The scope of a preferential right often arises when the seller seeks to force a preferential rightholder to buy more property—to accept a package deal that is broader than his preference—in order to exercise his right, a different issue than the one facing the Court. The majority approach in Texas is that a preferential rightholder cannot be compelled to purchase, or force the sale of, property not subject to the preferential right in a bundled transaction.[72]

Bernal relies heavily on one case in support of his argument, but that opinion simply is not on point. In *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., LLP*,[73] the issue was whether the holder of a preferential right to purchase land could be required—in order to exercise the right—to also purchase the galvanizing business on the land as part of a bundled sale. The court noted that generally the holder of a preferential right cannot be compelled to buy assets outside the scope of the option contract in order to exercise the right. But the *FWT* court found an exception when the preferential right is made subject to the terms and conditions of a third-party offer, and if the

---

[72] *See, e.g., Hinds v. Madison*, 424 S.W.2d 61, 64 (Tex. Civ. App.—San Antonio 1967, writ ref'd n.r.e.) (preferential rightholder with right of first refusal on small parcel of land was not entitled to purchase bundled package that included small parcel and much bigger ranch); *Riley v. Campeau Homes (Tex.), Inc*., 808 S.W.2d 184, 188–89 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.) (preferential rightholder could exercise his right to purchase one condominium unit, even though the unit was part of a larger bundled transaction; rightholder was not required to agree to purchase all units in order to exercise the preferential right).

[73] *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., LLP*, 301 S.W.3d 787 (Tex. App.—Fort Worth 2009, pet. denied).

35

condition that requires the purchase of additional assets is commercially reasonable, imposed in good faith, and not specifically designed to defeat the preferential right. If those conditions are satisfied, and *if* the rightholder still *wants* to proceed, he must buy the bundle.

*FWT* does not address the issue here: Can a landowner be *compelled* to sell its property when an affiliate gave a preferential right to purchase *different* property on the same terms and conditions as those contained in a third-party offer? Finding no cases to support Bernal's position, the Court will not order specific performance with respect to HBT Land and the Real Estate given the narrow scope of the preferential right contained in the Transfer Agreement.

> **3. Even if Bernal did somehow have a preferential right with respect to the Real Estate, the best he can do is accept *all* relevant conditions of the John Eagle Offer, step into the shoes of John Eagle, and attempt to negotiate a definitive agreement.**

Even if the Offering Notice and Reply Notice did bind HBT Land and cover the Real Estate, the result is *not* as simple as ordering HBT Land to sell the Real Estate to Bernal for $17 million. Although the Transfer Agreement details what form of agreement would be required to sell DK8's membership interest in HBT JV once Bernal exercised his preferential right (the straight-forward "Transfer Documents"), the Transfer Agreement is silent on the form of Real Estate sale agreement, other than (in Bernal's best case) referring to the terms and conditions of the John Eagle Offer. Bernal wants to pick and choose *one* relevant term and condition of the John Eagle Offer—the price—but ignore other critical terms and conditions contained in the John Eagle Offer.

For example, the John Eagle Offer conditioned the sale on the parties' negotiating and signing a definitive agreement, absent which the parties could walk away without penalty. HBT Land was fully within its rights to seek a definitive form of Real Estate purchase agreement that

contained provisions favorable to it, including a release. Bernal was also free to seek a definitive form of agreement without a release. But absent an agreement on the definitive sale document, both parties were free to walk away without penalty from the Real Estate sale.

In addition, the John Eagle Offer did **_not_** contain a financing contingency. Bernal's November 6, 2015 draft documents included a financing contingency for the Real Estate. HBT Land was free to choose whether or not to accept such a condition. HBT Land chose not to accept such a condition.

Finally, Bernal cannot establish any sort of waiver here such that it creates a contractual right that does not otherwise exist. Simply negotiating with Bernal to sell the Real Estate after the fact sheds no light on whether HBT Land thought it was legally required to do so by the Reply Notice. HBT Land's conduct was just as consistent, if not more so, with its right to negotiate for the sale of the Real Estate to any party it chose. HBT Land *wanted* to sell the Real Estate and *intended* to reach a definitive agreement with Bernal if possible, but that desire and intent is not evidence that HBT Land agreed it could be compelled to sell the Real Estate on unfavorable terms.[74] There was no "unequivocally inconsistent" conduct here as required for a finding of waiver.[75]

## VI. ADMISSION OF SETTLEMENT DOCUMENTS

Bernal objected to the Court's admission of DK8 Exhibit No. 22, Bernal's November 6, 2015 proposed Membership Interest Purchase Agreement and Real Estate Contract, as well as other draft agreements and communications, citing Federal Rule of Evidence 408. The primary purpose behind Rule 408 is to encourage settlement negotiations, which might be chilled if offers

---

[74] Again, price was just one term of the John Eagle offer.

[75] *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005).

of compromise may be used later as admissions of liability.[76] The rule is not an absolute ban on all evidence regarding settlement negotiations, however. Courts have admitted evidence of offers or agreements to compromise for purposes other than liability, such as to show bias or prejudice of a witness; rebuttal; impeachment; to show knowledge or intent; to show a continuing course of reckless conduct; and to prove estoppel.[77] Rule 408(b) contemplates just such exceptions. Indeed, even in this very dispute, before the matter was removed to this Court and during the temporary injunction hearing, Bernal successfully offered into evidence (among other items) a December 24, 2015 settlement email from DK8's counsel to Bernal's counsel to show that DK8 was proposing a form of draft membership purchase agreement that was (allegedly) inconsistent with the John Eagle Offer.[78] In addition, the November 6, 2015 draft documents were admitted into the record by the State Court in connection with Defendants' motion to reconsider the temporary injunction.

In deciding whether evidence should be excluded under Rule 408, "courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations."[79] The parties previewed this issue in their pre-trial briefing, so the Court carefully considered these issues before ruling at trial on the admission of these documents. The Court considered the purpose of the rule and decided that the need for the settlement evidence outweighed the chilling effect on future

---

[76] *Zurich Am. Ins,. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005); *see also U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949 (5th Cir. 1990).

[77] *Zurich Am. Ins., Co.,* 417 F.3d at 689.

[78] Temp. Inj. Hr'g. Tr. at 55–59, February 18, 2016. In what appears to have been an attempt to show that Bernal was shocked—shocked—to find that the DK8 December 24 draft did not have a floating purchase price that Bernal supposedly wanted and expected, that exchange curiously ignored (a) Bernal's November 6, 2015 draft membership purchase agreement, and (b) the fact that the email was sent long after the Reply Notice, when DK8 and its counsel hoped (in vain in turns out) that the closing was much closer at hand, despite repeated delays by Bernal in turning drafts of the documents. *See, e.g.,* Bernal Exs. 43, 45.

[79] *Zurich*, 417 F.3d at 689.

settlement negotiations. The Court admitted these documents for the purpose of determining whether Bernal lost his purported specific-performance rights through repudiation, waiver, or abandonment, and whether Defendants waived any rights or repudiated any agreements.[80]

## VII. BERNAL'S NOTICE OF ELECTION FILED PURSUANT TO THE SALE PROCEDURES ORDER

DK8, HBT Land, and Schnitzer have asked the Court to strike the following language that Bernal included in his Notice of Election:

> This Notice is furnished solely in conformity with the notice requirement in Paragraph 4(a) of the Sale Procedures Order and shall not be considered, construed, or deemed to have any substantive legal effect on any issue regarding Bernal's rights and remedies under applicable law and the contractual agreements among the parties.

When asked by the Court why the language was added to the election, Bernal's counsel responded that the Defendants' counsel were "seeing spaceships where they don't exist," but he could not satisfactorily explain why such language was necessary in the Notice of Election. The Court agrees with DK8, HBT Land, and Schnitzer that the language contained in the Notice of Election goes beyond what was permitted in the Sale Procedures Order and, therefore, should be stricken from the Notice of Election. The substantive legal effect, if any, of Bernal's election pursuant to the agreement memorialized in the Sale Procedures Order is an issue for another day, but the Sale Procedures Order does not permit Bernal to disclaim any such potential effect.

---

[80] Bernal also objected to the admission of the November 6, 2015 draft documents based on the parol evidence rule. "As a general rule for an unambiguous contract, evidence of prior or contemporaneous agreements is inadmissible as parol evidence." *Valiant Petroleum, Inc. v. FMC Techs., Inc.*, No. 13-11-00673-CV, 2013 WL 3377628, at *6 (Tex. App.—Corpus Christi July 3, 2013, no pet.). The Court did not consider the November 6, 2015 draft documents in determining whether the Reply Notice was ambiguous or in determining its meaning. Instead, the Court considered the November 6, 2015 draft documents solely to determine—assuming a contract was formed by the Reply Notice—whether either party repudiated the contract or waived or abandoned their rights.

## VIII.   CONCLUSION

In the end, Bernal substantially overshot his rights under the Transfer Agreement as it related to the Specific Performance Counts.  As a result, Bernal is subject to the legal consequences for such actions.  Although the Court is sympathetic with Bernal's compelling background and sincere desire to own this Dealership, the relevant evidence and applicable law make clear that Bernal's Reply Notice failed to form a contract, but even if a contract had been formed, Bernal's subsequent actions constituted a waiver or abandonment of his specific-performance rights or a repudiation of the contract.  And in any event, Bernal is not entitled to specific performance with respect to the Real Estate.  As a consequence, Bernal's Specific Performance Counts fail.  Therefore, for all the reasons detailed herein, the Court will enter a separate Judgement for Defendants DK8 and HBT Land on the Specific Performance Counts and a separate order striking the last paragraph of Bernal's Notice of Election.